In re LISANTI FOODS, INC.,
et al., Debtors.

Joseph M. Lisanti, Jr.,
et al., Appellants,

v.

Jay Lubetkin, Chapter 11 Trustee of Lisanti Foods, Inc., et al., and the Official Committee of Unsecured Creditors of Lisanti Foods, Inc., et al., Appellees.

No. CIV.A. 03–3868 (JCL).

United States District Court,
D. New Jersey.

Aug. 9, 2005.

Marc Francis Desiderio, Englewood Cliffs, NJ, for Appellants.

## MEMORANDUM AND ORDER

LIFLAND, District Judge.

Appellants Joseph M. Lisanti, Jr., Rosemarie Lisanti, Lisanti Realty of Arizona, Inc., Lisanti Realty Corp., Lisanti Enterprises, LLC, Texas Trucking Corp., JL Trucking, LLC, New Jersey Trucking Corp., and Arizona Freight Haulers, Inc. (collectively, the "Non–Debtor Entities") appeal from the May 17, 2004 Order Confirming Second Amended Joint Plan of Liquidation (the "Plan") entered by the Honorable Novalyn Winfield, U.S.B.J. This appeal disputes certain evidentiary determinations of the bankruptcy judge as well as the legal sufficiency of the Plan under the applicable provisions of the Bankruptcy Code ("Code"). For the reasons set forth below, the Order of the Bankruptcy Court will be affirmed.

## BACKGROUND

### A. Procedural History and General Facts

This appeal arises in connection with the Debtors' Chapter 11 liquidation proceeding pending in the Bankruptcy Court. Debtors filed voluntary petitions for relief under Chapter 11 of the Code on November 20, 2002. These cases were subsequently consolidated for joint administration. On November 29, 2002, the United States Trustee for the District of New Jersey ("Trustee") appointed an Official Committee of Unsecured Creditors pursuant to §§ 1102(a) and (b) of the Bankruptcy Code.

The Debtors were wholesale distributors of Italian specialty foods and food-related products to, among others, food retailers and restaurants. The Non–Debtor Entities operated the distribution centers and delivered the specialty foods and related products to the Debtors' customers.

Joseph M. Lisanti, Jr. is the former President of Lisanti Foods, Inc. Mr. Lisanti and his sister, Rosemarie Lisanti ("Lisantis"), are the sole officers, shareholders, and/or members of each of the Non–Debtor Entities. Lisanti Realty of Arizona, Inc., Lisanti Realty Corp., and Lisanti Enterprises, LLC, own or had owned certain warehouse facilities and offices located in Arizona, Texas, and Totowa, New Jersey.

By Order dated January 21, 2003, the Bankruptcy Court, *inter alia,* (1) approved

the sale of substantially all of the assets of Lisanti Foods, Inc. to Ferraro Foods, Inc. and further approved the auction sale of any remaining assets of Lisanti Foods, Inc. in Totowa, and (2) approved the sale at auction of all of the remaining assets of Lisanti Foods of Arizona, Inc. and Lisanti Foods of Texas, Inc. to the highest bidder. On January 30, 2003, upon the Trustee's motion, Jay L. Lubetkin was appointed as Chapter 11 Trustee with regard to the liquidation and distribution of the Debtors' consolidated estate.

### B. Second Amended Joint Plan of Liquidation

The Official Committee of Unsecured Creditors and the Chapter 11 Trustee filed the Plan and related Disclosure Statement in the Bankruptcy Court on October 14, 2003. On December 17 and 18, 2003, Judge Winfield heard argument on whether the proposed Plan satisfied the requirements of the Code. On April 13, 2004, the Bankruptcy Court conducted further hearings on confirmation of the Plan, during which it detailed reasons for finding that the Plan should be confirmed. This decision was memorialized in the May 17, 2004 Order appealed from in the present matter.

*Bankruptcy Court Order Confirming the Plan*

This Court has reviewed Judge Winfield's April 13, 2004 oral decision confirming the Plan. It is evident from the transcript that the bankruptcy court considered Appellants' objections to confirmation. The Bankruptcy Court acknowledged that the burden is on the plan proponents to prove that all the applicable provisions of 11 U.S.C. § 1129 have been satisfied. (Appendix to Brief of Appellees, Exh. 1, at 4 ll. 5–10)(citing *In re Greate Bay Hotel & Casino, Inc.,* 251 B.R. 213 (Bankr.D.N.J.2000)). In reaching her decision, Judge Winfield relied on the testimony of the Chapter 11 Trustee, accountant Bernard Katz (who testified as to how consolidation of the estates would inure to the economic benefit of creditors), and the documentary evidence. (Appellees' Appx, Exh. 1, at 4 ll. 11–15).

### STANDARD OF REVIEW

The standard of review to be applied by a district court reviewing a ruling of a Bankruptcy Judge is determined by the nature of the issues presented on appeal. Legal conclusions of the Bankruptcy Court are subject to *de novo* or plenary review. *Donaldson v. Bernstein,* 104 F.3d 547, 551 (3d Cir.1997); *Chemetron Corp. v. Jones,* 72 F.3d 341, 345 (3d Cir.1995); *In re Carretta,* 220 B.R. 203, 210 (D.N.J. 1998). However, the factual determinations of the bankruptcy court are not to be set aside unless "clearly erroneous." *Fed. R. Bankr.P.* 8013 (stating that "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous"); *Chemetron Corp.,* 72 F.3d at 345; *In re Indian Palms Assocs., Ltd.,* 61 F.3d 197, 203 (3d Cir.1995). This standard requires the district court to "give due regard to the opportunity of that court to judge, first-hand, the credibility of the witnesses." *Fellheimer, Eichen & Braverman, P.C. v. Charter Techs., Inc.,* 57 F.3d 1215, 1223 (3d Cir.1995); *Fed. R. Bankr.P.* 8013. Where a matter presents mixed questions of law and fact, the reviewing court will apply the relevant standard to each component of the issue. *Chemetron,* 72 F.3d at 345.

The Bankruptcy Court's exercise of discretion is reviewed "for abuse thereof." *In re Prof'l Ins. Mgmt.,* 285 F.3d 268, 283–84 (3d Cir.2002); *In re Trans World Airlines, Inc.,* 145 F.3d 124, 132 (3d Cir.1998).

## DISCUSSION

Appellants present the following issues in this appeal:

1. Whether the Bankruptcy Court erred in admitting into evidence documents and testimony of Appellees' expert witness in connection with the proposed confirmation of Appellees' Second Amended Joint Plan of Liquidation.

2. Whether confirmation of the Plan was in error because of defects in the solicitation of ballots for acceptance or rejection of the Plan and further defects in the computation and certification of the ballots received.

3. Whether Plan confirmation was in error because the Plan did not meet the prerequisites for substantive consolidation of the Debtors. Alternatively, whether the Plan provides adequate means for its implementation through substantive consolidation.

4. Whether confirmation of the Plan was in error because the Disclosure Statement contained inadequate information.

5. Whether confirmation of the Plan was in error because Appellees failed to comply with the required elements for plan confirmation found in 11 U.S.C. § 1129(a).

6. Whether confirmation of the Plan was in error because the Plan failed to provide for payment of all administrative claims on the Effective Date.

7. Whether confirmation of the Plan was in error because the Plan vested the liquidating trustee and the oversight committee with broad powers not subject to the supervision of the Bankruptcy Court.

### I. Overview of 11 U.S.C. § 1129

According to a leading bankruptcy treatise:

Confirmation of a plan of reorganization is the statutory goal of every chapter 11 case. Section 1129 of the Bankruptcy Code provides the requirements for such confirmation, containing Congress's minimum requirements for allowing an entity to discharge its unpaid debts and continue its operations. [Section 1129(a) ] contains thirteen paragraphs, each of which contains a separate requirement that must be met in order to confirm the plan.

COLLIER ON BANKRUPTCY ¶ 1129.01.

 Therefore, the Code's statutory framework governs the Bankruptcy Court's decision to confirm a plan. In some places, § 1129 provides its own substantive requirements while in other places § 1129 more generally requires plan compliance "with the applicable provisions of [title 11]." Consequently, review of a proposed plan for compliance requires consideration of both § 1129 and other relevant sections of the Code. The following review of the Bankruptcy Court's Order distinguishes between Appellants' objections based on purported non-compliance with § 1129 and objections based on non-compliance with other applicable title 11 provisions.

### 1. Substantive Consolidation: Background and Prerequisites

 Substantive consolidation results in the pooling of the assets of, and claims against, two or more entities, thereby satisfying liabilities from the resultant common fund, eliminating duplicate claims, and combining the creditors of the two entities for purposes of voting on reorganization plans. *In re Morfesis,* 270 B.R. 28, 31 (Bankr.D.N.J.2001). The power to order substantive consolidation of bankruptcy estates is within the Bankruptcy Court's equitable powers under § 105 of the Code. *See Fed. Deposit Ins. Corp. v.*

*Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir.1992); *see also In re Stone & Webster, Inc.,* 286 B.R. 532, 539 (Bankr.D.Del.2002); 2 COLLIER ON BANKRUPTCY ¶ 105.09[1][6] ("the authority of a bankruptcy court to order substantive consolidation derives from its general discretionary equitable powers."). "As an equitable remedy, substantive consolidation is to be used to afford creditors equitable treatment and thus may be ordered when the benefits to creditors exceed the harm suffered." *In re Worldcom Inc.,* No. 02–13533, 2003 WL 23861928, at *35 (Bankr.S.D.N.Y. Oct.31, 2003) (citing *In re Augie/Restivo Baking Co., Ltd.,* 860 F.2d 515, 518–19 (2d Cir. 1988)).

■■■ The party requesting substantive consolidation must show: (1) a substantial identity between the entities to be consolidated; (2) that consolidation is necessary to avoid harm or to achieve some benefit; and (3) in the event that the creditor shows harm, that the benefits of consolidation "heavily" outweigh the harm. *In re Morfesis,* 270 B.R. at 31 (citing *In re Auto–Train Corp.,* 810 F.2d 270, 276 (D.C.Cir.1987)).

With respect to whether the Bankruptcy Court properly considered these factors, there is ample evidence in the record to uphold the Bankruptcy Court.

Judge Winfield found that the proponents had proved a substantial identity between the parties to be consolidated, based on the testimony of the Trustee and Mr. Katz. As the court summarized the Trustee's testimony:

Mr. Lubetkin testified that without contradiction that all three debtors have the same officers, same directors and shareholders. They conducted the same general business operations under very similar names. His review of inter-company transactions revealed that intercompany dealings were done without the usual corporate formalities … no promissory notes were prepared, and no corporate resolutions reflected either the borrowing or the lending.

(*Id.,* at 15 ll. 8–17.).

In further support of the identity of interest among the three debtors, Mr. Katz testified, for example, that the debtors did not charge each other for services rendered and all accounts receivable were billed from the New Jersey debtor's facility. (*Id.,* ll. 18–21.). After reviewing further testimony from the Trustee and Mr. Katz, the court found that "members of the Creditors' Committee and other vendors … viewed the debtors as a single entity when extending credit terms." (*Id.,* at 16–17.). The Bankruptcy Court therefore concluded that the proponents had established that the debtors all shared a substantial identity of interest.[1]

Next, the court determined that the testimony of the Trustee and Mr. Katz demonstrated that consolidation benefits creditors. Appellants contend that the "only potential benefit" advanced by Appellees was the elimination of determining professional fees on a case-by-case basis. (Appellants' Br., at 21.). While Judge Winfield only quoted from the Trustee's testimony as it related to allo-

---

1. Appellants also object to the bankruptcy court's reliance on "nothing more than the general testimony of the Trustee and the opinion testimony of the Appellees' financial expert" as to the proven need for substantive consolidation (Appellants' Br., at 21.). However, the record does not support the conclusion that these opinions were unfounded.

Included in the record is Mr. Katz's recommendation on substantive consolidation, which was based on review of the debtors' business records, accounts receivable, as well as proofs of claim, pending litigation, and consultation with members of the Creditors' Committee. (Appellees' Appx, Exh. 15.).

cation of professional fees, it is clear that the proponents presented other persuasive testimony as well. For example, the Bankruptcy Court detailed the difficulties attendant upon administering the three estates separately:

> Lubetkin and Katz testified that the consolidation benefits rather than harms the creditors. In large measure their testimony centered on the cost to administer three separate estates and on the difficulty and expense in separating the financial affairs of the three entities ... Lubetkin testified that the allocation of liabilities and expenses would have to be done on both a post-petition and a prepetition basis, and some of the determinations of how to allocate would be difficult ... [i]t seems to me it would be appropriate to allocate the general accounting, accounts payable, accounts receivable, cash management operations of the debtor that was located in New Jersey but performed services for all three debtors among all three debtors, and then with regard to the adversary proceeding there are certainly claims and causes of action in that proceeding, recoveries upon which would be very, very difficult to allocate.

(Appellees' Appx, Exh. 1, at 17 ll. 4–25.).

Additionally, the Trustee's affidavit listed as benefits of substantive consolidation the elimination of inter-company debts, allowing creditors to share pro rata in the assets of the consolidated debtors once claims are pooled against a single entity, and the appointment of only one Liquidating Trustee administering the consolidated estate.

With respect to the pro rata share in the consolidated estate, Appellants maintain their objection that under consolidation the creditors of Lisanti Foods, Inc. will receive a diluted recovery. Because all the assets of the debtor entities are pooled, the assets of one debtor may be used to pay the creditors of another debtor. In this regard Appellants argue that consolidation clearly harms, not benefits, them because they are creditors of a solvent debtor. The Bankruptcy Court acknowledged the theoretical merit of Appellants' position, but found that practically it does not prevent consolidation in this case. The court found that Lisanti Foods, Inc.'s (the debtor entity of which Appellants are creditors) market value was significantly less than the total assets listed on its schedules, a fact suggesting that Appellants' anticipated recovery on a consolidated basis would not necessarily be less than on a separate estate-by-estate basis. Therefore, the Court rejected a factual underpinning to Appellants' assertions that they would be harmed by the consolidation. That rejection was not clearly erroneous.

The Bankruptcy Court did not abuse its discretion when it found that the proponents demonstrated the prerequisites for substantive consolidation.

## II. *Objections Under § 1129*

### 1. *"Best Interests"*

█ Appellants argue that the Bankruptcy Court erred in finding that the Plan satisfied the "best interests" test of § 1129(a)(7). Appellants note that substantive consolidation would not be possible in a Chapter 7 liquidation, and thus "all of the value of Lisanti Foods, Inc. estate would inure to the benefit of holders of Allowed Claims against that entity." (Appellants' Br., at 15–16.). As dissenting claimants, Appellants contend that they were entitled to proof that they would not receive less under the Plan on the Effective Date than they would in a Chapter 7 liquidation. Furthermore, Appellants argue that the lack of a definite effective date in the Plan made it impossible for the

Bankruptcy Court to determine what value claim holders would receive.

Appellees respond that the best interests analysis must take into account the costs of a Chapter 7 liquidation. Appellees refer to the testimony of the Chapter 11 Trustee concerning the increased value for claim holders under Chapter 11 because of less delay and administrative expenses. The Bankruptcy Court agreed and observed that the Plan called for liquidation on the model of Chapter 7, but without the cost and delay.

Under 11 U.S.C. § 1129(a)(7), the court shall confirm a plan only if:

With respect to each impaired class of claims or interests—(A) each holder of a claim or interest of such class—(i) has accepted the plan; or (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

"The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept the plan." *Bank of America Nat. Trust & Sav. Ass'n v. 203 North LaSalle St. Partnership,* 526 U.S. 434, 442 n. 13, 119 S.Ct. 1411, 143 L.Ed.2d 607 (1999). It is the plan proponent's burden to prove that the plan complies with section 1129(a)(7). *In re MCorp Financial, Inc.,* 137 B.R. 219, 228 (Bankr.S.D.Tex.1992). That burden is met by showing that creditors will receive at least as much under the Plan as they would receive in a liquidation of the Debtors' assets under chapter 7. *In re Resorts Int'l. Inc.,* 145 B.R. 412, 477–78 (Bankr. D.N.J.1990). In making such a showing, the liquidation value of the debtor's assets is controlling. *See id.* Moreover, the costs of a chapter 7 case must also be

taken into account. *In re American Family Enterprises,* 256 B.R. 377, 403 (D.N.J.2000)(citing *In re Montgomery Court Apartments,* 141 B.R. 324 (Bankr. S.D.Ohio 1992)).

The application of the best interests test involves a hypothetical application of chapter 7 to a chapter 11 plan. *In re Stone & Webster, Inc.,* 286 B.R. 532, 544 (Bankr.D.Del.2002). "A liquidation and distribution analysis is performed to see whether each holder of a claim or interest in each impaired class, as such classes are defined in the subject plan, receive not less than the holders would receive in a 'hypothetical Chapter 7 distribution' to those classes." *Id.* at 544–45 (citing 7 COLLIER ON BANKRUPTCY ¶ 1129.03[7][b] ).

Here, the Bankruptcy Court found the Plan to be substantively indistinguishable from a Chapter 7 liquidation in terms of distribution. Judge Winfield explained:

[T]his is a liquidating plan which provides for payment of claims in accordance with the distributive provisions of Chapter 7 in essence. In this Court's view this liquidating plan is in effect a Chapter 7 liquidation without the attendant costs and delay of conversion. Accordingly, I find 1129(a)(7) is met.

(Appellees' Appx., Exh. 1, at 25.).

There is clear support for this conclusion in both the testimony presented and the Disclosure Statement. The Bankruptcy Court accepted the Trustee's testimony that "general unsecured creditors will receive substantially more and those sums substantially more quickly than they will if the cases are converted to a Chapter 7 proceeding." (*Id.,* Exh. 2, at 62.). The Trustee further opined:

[T]here's a very significant benefit to the creditors of the bankruptcy estates from substantive consolidation and among the significant benefits are avoiding what

would be extremely high professional fee costs and extremely long delays associated with trying to administer the estates on a separate basis. It requires allocating assets among the three separate estates, allocating liabilities among the three separate estates and that process needs to be done not only on a post-petition basis, but on a pre-petition basis. And for some assets and some liabilities it's relatively easy to allocate, but for others it's virtually impossible without making subjective determinations and to me the consequences of those subjective determinations to creditors are necessarily unfair. By way of example ... [i]t seems to me it would be appropriate to allocate the general accounting, accounts payable, accounts receivable, cash management operations of the Debtor that was located in New Jersey but performed services for all three Debtors amongst all three Debtors, and then with regard to the adversary proceeding, there are certainly claims and causes of action in that proceeding, recoveries upon which would be very, very difficult to allocate.

(*Id.* at 69–70.).

While this does not explicitly speak to whether general unsecured creditors will receive at least as much as they would have under Chapter 7, it does document the administrative expenses that would undoubtedly negatively impact what they would receive under Chapter 7.

Section VII.A of the Second Amended Disclosure Statement considered the alternative of chapter 7 liquidation and its potential effect on claim holders: "The Proponents believe that a chapter 7 liquidation would result in substantially the same amount of assets liquidated for distribution due to the fact that the Bankruptcy Court previously found that the purchase price paid pursuant to the Asset Sales was the highest and otherwise best offer for the Debtors' inventory assets." (Appellees' Appx., Exh. 5, VII.A). By contrast, a chapter 7 liquidation "would result in substantial diminution in the value to be realized by Holders of Allowed Claims because of the additional administrative expenses ...." (*Id.*). Therefore, based on the liquidation value of the Debtors' assets, the proponents contended that chapter 11 liquidation would not diminish the claim holders' recovery. Rather, it would maintain the recovery amounts while limiting the related costs. The Court finds that this satisfied the proponents' burden under 11 U.S.C. § 1129(a)(7).

As to the lack of a definite Effective Date, the Bankruptcy Court correctly noted (and Appellants acknowledged in their objections to confirmation) that the Code does not define "effective date." *See* COLLIER ON BANKRUPTCY ¶ 1129.06[1][e], at 1129–171 (The Code does not define "effective date." Rather, the terms of each confirmed plan will set the effective date. Most often, the effective date of the plan will be tied to ... the satisfaction of conditions contained in the plan. In the absence of any contrary indications ... the date the confirmation order is entered should be the effective date.). The Plan set the effective date as "the first business day that is ten days after the Confirmation Date." Judge Winfield recognized that "the effective date of the plan is several months down the road, because it is not possible at this particular time to know the timing of the recoveries on the matters that remain to be liquidated." (Appellees' Appx., Exh. 1, at 28.). However, the Bankruptcy Court also noted that under the facts of this case, waiting for recovery on matters not yet liquidated before confirming the plan would cause the parties to lose the benefits of substantive consolidation. The Court sees no error in this determination.

## 2. *Payment of Administrative Claims*

 Appellants argue that the Bankruptcy Court erroneously confirmed the Plan even though it was aware the administrative claims would not be paid on the Effective Date, a violation of 11 U.S.C. § 1129(a)(9)(A). Appellees contend first that Appellants do not have standing under this section to object because they do not hold an allowed administrative claim under the Plan. Assuming Appellants have standing, Appellees also argue that the Plan provides for timely distributions to claim holders.

Unless the holder of a particular claim agrees otherwise, 11 U.S.C. § 1129(a)(9)(A) requires that the holder of an administrative claim receive payment on the effective date of the plan. As provided in the Plan, the "effective date" in this case is "the first business day that is ten (10) days after the Confirmation Date."

In pertinent part, the Plan defines "administrative claim" as "all Allowed Claims that are entitled to be treated as Administrative Claims pursuant to a Final Order of the Bankruptcy Court under § 546(c)(2)(A) of the Bankruptcy Code." The Plan further defines an "allowed" claim as "any Claim against the Debtors . . . against which filed Claim no objection to the allowance thereof has been or will be interposed, or as to any such objection there has been a Final Order entered or (3) any Claim which has been allowed by a Final Order of the Bankruptcy Court." With respect to administrative claims, the Plan provides that such claims will be paid "on, or as soon as reasonably practicable after, the latest of: (i) the Initial Distribution Date (defined as on or before 90 days following the Effective Date); the date such Administrative Claim becomes an Allowed Administrative Claim; or (iii) the date such Administrative Claim becomes payable pursuant to any agreement between the Liquidating Trustee and the Holder of such Administrative Claim." (Appellees' Appx., Exh. 4, at 13.). Therefore, Appellants argue, the terms of the Plan do not provide for payment of administrative claims on the Effective Date, as required by § 1129(a)(9)(A).

Judge Winfield expressly noted that the provisions of the Plan dealing with payment of administrative claims were "imprecise," but nevertheless found compliance with § 1129(a)(9)(A):

> I will concede that the date by which administration claims will be paid is imprecise, but I also point out that nothing in the Code establishes a particular or precise time line, and accordingly, that date can and does often times vary with the facts of a particular case . . . The reality is, as apparent from Mr. Lubetkin's testimony, that payment to administration creditors and indeed the effective date of the plan is several months down the road, because it is not possible to at this particular time know the timing of the recoveries on the matters that remain to be liquidated . . . [I]f I confirm now, we get the benefits of the substantive consolidation, and we continue the oversight of the unsecured creditors, a constituency that has a great interest in having the initial distribution date occur sooner rather than later, so I think there's a safeguard there. Therefore, I find that the period within which administrative creditors and indeed even unsecured creditors will receive payment as sufficiently certain.

(*Id.*, Exh. 1, at 28–29.).

The Court finds no error in Judge Winfield's determination that the Plan complied with § 1129(a)(9)(A). First, objections to Appellants' claims are currently pending in the Bankruptcy Court. Because these claims are not "allowed" as defined by the Plan, Appellants do not yet

have any entitlement to payment of their administrative claims unless and until the Bankruptcy Court so orders. Second, as Judge Winfield correctly noted, the timing of payment on administrative claims may vary with the facts of a given case. *See, e.g., In re PWS Holding Corp.*, No. 98–212, 1999 WL 33510165, at \*6 (Bankr.D.Del. Dec.30, 1999) (confirmation of plan providing that "on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable, the holder of such Claim will receive on account of such Claim Cash in an amount equal to the Allowed amount of such Claim.").

### 3. *Post–Confirmation Expenses*

██ Appellants argue that the Plan fails under 11 U.S.C. § 1129(a)(4) because it did not require Bankruptcy Court approval for fees and expenses of the Trustee and other necessary professionals. Relying on a decision from the Northern District of Texas, Appellees respond that § 1129(a)(4) is applicable only to pre-confirmation services. The new entity created by reorganization is therefore not subject to the jurisdiction of the Bankruptcy Court.

Pursuant to § 1129(a)(4), a Plan should not be confirmed unless fees and expenses related to the Plan have been approved, or are subject to the approval, of the Bankruptcy Court. Paragraph 5.13 of the Plan provides that the Liquidating Trust may employ necessary professionals and compensate them monthly "without further notice, hearing, or approval of the bankruptcy court."

The bankruptcy judge found that the Plan complied with § 1129(a)(4) "since the plan provides for payment of only allowed administrative expenses, and all fees and expenses of professionals are subject to review by me." (Appellees' Appx., Exh. 1,

at 24.). The Plan provides that "the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and the Plan to the fullest extent permitted by law, including, among other things, jurisdiction to:"

> Hear and determine all applications for compensation and reimbursement of expenses of Professionals under the Plan or under section[ ] ... 1129(a)(4) of the Bankruptcy Code; *provided, however,* that from and after the Effective Date, the payment of the fees and expenses of the Liquidating Trust shall be made in the ordinary course of business and shall not be subject to approval of the Bankruptcy Court.

(Appellees' Appx., Exh. 4, Art. 11, ¶ (b).)(emphasis in original).

██ 11 U.S.C. § 1129(a)(4) requires approval of fees for pre-confirmation services. *See, e.g., In re Stations Holding Co., Inc.*, No. 02–10882, 2002 WL 31947022, at \*3 (Bankr.D.Del. Sept.30, 2002) (confirming under § 1129(a)(4) plan requiring bankruptcy court approval for fees "to the extent of services provided before the Confirmation Date"); *see also In re Briscoe Enter. Ltd.*, 138 B.R. 795, 809 (N.D.Tex.1992) ("[T]he reorganized debtor is a new entity not subject to the jurisdiction of the bankruptcy court, except as provided in the plan. Therefore, approval of fees for post-confirmation services is not required. 11 U.S.C. § 1129(a)(4) calls for approval of fees for pre-confirmation services [ ].") Therefore, in this case the Plan was not required to mandate bankruptcy court approval for fees and expenses related to post-confirmation administration of the estate.

### III. *Objections Under Other Applicable Provisions of Title 11*

Pursuant to 11 U.S.C. § 1129(a)(1) and (2), in addition to complying with the sub-

stantive requirements of § 1129, a proposed plan must also comply with the applicable provisions of title 11. Appellants argue that the Plan fails to comply with five provisions of title 11.

### 1. Defects in Balloting for Acceptance or Rejection of the Plan

Appellants devote a significant portion of their argument to the allegedly defective process by which the Appellees solicited creditors' ballots and subsequently certified the number of creditors voting for and against the Plan. Specifically, Appellants contend that the proponents' Certifications do not "correctly reflect the proper 'number' of ballots voting in favor or opposition to the Plan nor the proper dollar amounts of the creditors' votes in favor and/or in opposition to the Plan." (Appellants' Br., at 35.)

Appellants' argument focuses first on discrepancies between the dollar amounts reflected on the ballots themselves and the amounts reflected in the Initial and Supplemental Certifications. (*Id.* at 36.). Because class acceptance of a plan is achieved when the creditors accepting the plan hold at least two-thirds in amount and more than one-half in number of allowed claims, the obvious effect of such distortions is that they potentially convey imprecise voting results.

Second, Appellants argue that the Initial Certification improperly aggregated certain ballots. (*Id.* at 36–40.). In other words, even though the three separate Debtors' cases had not yet been substantively consolidated, the Certification combined a given creditor's separate ballots into one dollar amount. Therefore, Appellants argue generally that the ballot certi-

fication process was result-oriented and arbitrary. (Appellants' Br., at 36, 42).

Pursuant to 11 U.S.C. § 1126(c):

A class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan.

The Trustee noted in the Supplemental Certification of Balloting that "since the Plan provides for substantive consolidation of the Debtors' bankruptcy estates, ballots should be analyzed on a substantively consolidated basis." (Appellees' Appx., Exh. 8, ¶ 5.). Per Judge Winfield's request, the Trustee provided an analysis of balloting on both a separate-estate basis and a substantively consolidated basis. (*Id.*).

The Court has reviewed the Trustee's explanation of the balloting methodology and the accompanying spreadsheet analyzing the creditors' voting. In analyzing votes by dollar amount, the Trustee counted votes according to each creditor's allowed claim. The dollar amount accorded each allowed claim corresponds to the amount in each creditor's filed proof of claim. (*Id.* ¶ 11.). Where no proof of claim was filed, the Trustee used the amount appearing on the Debtors' Schedules and Statement of Financial Affairs. (*Id.*). This was correct.

Significantly, the Trustee also performed an alternative analysis of the votes that took a conservative approach to the claim amounts of each creditor. Essentially, this approach minimized the amounts of the claims of the voters who accepted the Plan but maximized the alleged claims of the Appellants who rejected the Plan. (*Id.* ¶ 14.).[2] Using this approach, and under

**2.** Appellees argue that Appellants' votes should not have even been counted in the

Trustee's alternative analysis. *See* 11 U.S.C. § 502(a) (providing that a claim or interest is

both a separate estate-by-estate analysis and a consolidated basis analysis, the Plan was overwhelmingly approved.

Judge Winfield approved the Trustees' counting of the ballots in the following terms:

> The Court finds appropriate the proponents' methodology of counting both the dollar amount in number of claims, and the Court specifically rejects the objector's contention that the claim should be counted by the dollar amount listed on the ballot as opposed to the allowed amount of the claims as shown by the proof of claim or on the schedules. I find their proposal simply too imprecise. I find, in fact, that the proponents' approach to counting ballots was a conservative, gave a more than fair reading of the ballots, and accordingly, I find no problem there.

(*Id.*, Exh. 1, at 25–26.).

■ Appellants' objections to the dollar amounts used in the Trustee's analysis are resolved by reference to the Bankruptcy Code's provisions on allowed claims. The value of an "allowed claim" is based on the filed proof of claim. *See In re DiDaniele*, No. 01–55091, 2002 WL 535320, at *3 (Bankr.D.N.J. Feb.28, 2002) ("A proof of claim executed and filed as provided in the Bankruptcy Rules is prima facie evidence of the amount and validity of the claim."). Therefore, it was appropriate for the Trustee to tabulate votes and dollar amounts according to each creditor's allowed claim as opposed to the amount on the ballot. The Trustee's spreadsheet clearly indicates that based on dollar amounts alone, the Plan was accepted as to each of the three debtor entities individually as well as on a combined basis. Therefore the Court

sees no error in the analysis of votes by dollar amount.

With respect to improper aggregation of ballots, Judge Winfield noted that "until the cases are consolidated you have to count [the ballots] separately." (Appellees' Appx., Exh. 1, at 30.). While the Bankruptcy Court disagreed with the proponents' position that ballots should be analyzed on a substantively consolidated basis, it saw no need to comment further "because on requesting the recount ... from the plan proponents here on an estate-by-estate basis, it's obvious that there were sufficient votes." (*Id.* at 31.). This Court agrees that the estate-by-estate analysis indicates that the Plan was accepted, thus rendering unnecessary a discussion of the aggregated balloting issue.

### 2. *"Adequate Means" for Plan Implementation*

■ Appellants first argue that the Plan does not provide "adequate means" for its implementation as required under 11 U.S.C. § 1123(a)(5). They argue essentially that the Plan erroneously presupposed substantive consolidation without the proponents first satisfying their burden of proving that consolidation was even appropriate in this case. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enter., Ltd.*, 994 F.2d 1160, 1165 (5th Cir.1993) (proponent of plan must show by a preponderance of the evidence that plan satisfies the requirements of § 1129). Appellants assert that controlling law requires the proponents to prove that the benefits of consolidation outweigh the harms "on a non-consolidated, debtor by debtor basis—that consolidation may be better for the

---

not deemed "allowed" for purposes of 11 U.S.C. § 1126(c) if a party in interest objects). The record reflects that Appellants' claims are subject to a pending objection. However, as

the Plan was accepted even allowing Appellants' claims, it is not necessary to resolve this issue.

consolidated entity as a whole is of no moment." (Appellants' Br., at 22–23.).

In § 1123(a)(5), the Code provides a non-exclusive list of the types of "adequate means" for plan implementation. COLLIER ON BANKRUPTCY ¶ 1123.01[5] ("The types of means listed in section 1123(a)(5) are clearly illustrative and not exclusive."). Among the means listed are: retention by the debtor of estate property; transfer of estate property to one or more entities; merger or consolidation of the debtor with other persons; sale of estate property; and satisfaction of liens. 11 U.S.C. § 1123(a)(5)(A)-(J).

As the Bankruptcy Judge noted, Article 5 of the Plan provided for the creation of the liquidating trust (and the appointment of a liquidating trustee), substantive consolidation of the debtors' estates, transfer of estate property to the liquidating trust, and the creation of an oversight committee. As Judge Winfield stated:

> I find that Article 5 of the plan provides an adequate means for implementation of the plan. First by substantive consolidation of the debtor estates ... [s]econdly, by transfer of all of the bankruptcy estate assets including causes of action to a liquidating trust together with appointment of a liquidating trustee and oversight committee ... I find in this case in general in effect these types of cases and these types of trusts permit conclusion of the Chapter 11 in much the same way as would occur in a Chapter 7 liquidation, but—and I think this is an important point—with the greater participation—creditor participation that's afforded by means of the Oversight Committee.

(Appellees' Appx, Exh. 1, at 6 ll. 5–21.)

These constitute "means" for the Plan's implementation under section 1123(a)(5). In response to the Appellants' objection that the amount of recovery from the causes of action transferred to the liquidating trust was speculative, the Bankruptcy Court reasoned:

> I do not find in that regard that to demonstrate adequate means of plan implementation that the proponents had to provide an exhaustive valuation of each piece of the litigation. The showing by the proponents that the recovery could range from 4 to 40% was I think sufficient. Certainly on its face, such a wide variation in recovery speaks volumes, and the estimation in this Court's view provided each creditor with information that the prospect for a nominal dividend was, in fact, real. I don't think anymore was needed in the context of a liquidating plan.

(*Id.*, at 11 ll. 9–18.).

The Court is satisfied that the proponents proved adequate means for implementation of the Plan and finds no error in the Bankruptcy Court's ruling.

### 3. Adequacy of Disclosure Statement

■ Appellants object that the Disclosure Statement submitted in connection with the Plan was deficient because it did not adequately disclose: (a) that substantive consolidation would result in the unequal treatment between and among the Class 3 (general unsecured) creditors of each individual debtor; (b) that substantive consolidation would result in a diminished recovery and/or the potential loss of a defense (i.e., insolvency) to any avoidance action (i.e., preference and/or fraudulent conveyance actions) commenced against them; (c) any legitimate basis for consolidation; and (d) the distinct assets and liabilities, and the amount of claims asserted against each of the separate debtor entities. (Appellants' Br., at 27–28.). Appellants also contend that the lack of substantive information in the Disclosure

Statement left creditors "to guess as to what substantive consolidation was, not to mention whether it was appropriate in these cases or what the potential ramifications were." (*Id.* at 28.). In sum, Appellants argue that the Bankruptcy Court erroneously held that the limited analysis of substantive consolidation in the Statement provided creditors with sufficient information on the consolidation proposal.

Section 1125(a)(1) of the Bankruptcy Code requires that a Disclosure Statement provide "adequate information" to claim holders to enable an informed judgment about the proposed plan. "Adequate information" is "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan ...." 11 U.S.C. § 1125(a)(1); *see also Krystal Cadillac–Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 322 (3d Cir.2003) ("The importance of full disclosure is underlaid by the reliance placed upon the disclosure statement by the creditors and the court. Given this reliance, we cannot overemphasize the ... obligation to provide sufficient data to satisfy the Code standard of adequate information."). Section 1125 affords the Bankruptcy Court substantial discretion in considering the adequacy of a disclosure statement. *In re River Village Assoc.*, 181 B.R. 795, 804 (E.D.Pa.1995).

The legislative notes to § 1125 provide that "[b]oth the kind and form of information are left essentially to the judicial discretion of the court, guided by the specification ... that it be of a kind and in sufficient detail that a reasonable and typical investor can make an informed judg-ment about the plan. The information required will necessarily be governed by the circumstances of the case." 11 U.S.C. § 1125 Notes of Committee on the Judiciary, S.R. No. 95–989.

"Disclosure is the pivotal concept in reorganization practice under the code." Collier on Bankruptcy ¶ 1125.02. Its aim is to provide creditors with relevant information on the likelihood and amount of eventual distributions. *See id.* ¶ 1125.02[1] (noting with approval one district court's statement that "the disclosure statement must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution."). However, "adequate information" within the meaning of § 1125(a)(1) is not a static concept:

> Precisely what constitutes adequate information in any particular instance will develop on a case-by-case basis. Courts will take a practical approach as to what is necessary under the circumstances of each case .... There will be a balancing of interests in each case. In reorganization cases, there is frequently great uncertainty. Therefore the need for flexibility is greatest.

*Id.* (quoting *H.R.Rep. No. 95–595*, at 409, U.S.Code Cong. & Admin.News 1978, pp. 5963, 6365 (1977)).

Judge Winfield held:

> The standard for adequacy of disclosure in 1125(a) is whether the information is sufficient to allow a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan. Case law points out that this is an intentionally flexible standard as adequacy is determined on a case-by-case basis ... the Court does not have to presume that the hypothetical reasonable investor/creditor is a blank slate, or that it

has the knowledge or business sophistication of a fifth grader.

(Appellees' Appx, Exh. 1, at 12.).

In addition, the Bankruptcy Court was satisfied that the Disclosure Statement adequately described the effect of substantive consolidation on creditors' recoveries as well as the assets and liabilities of the estates consolidated into a single entity:

> Section 1.30 of the plan describes estate assets as collectively, all of legal and equitable right in and to all assets, property, interests, and so on held at any time by the estates ... Section 2, part (c) which contains the chart which projects the estimated minimum/maximum recoveries, plainly reflects the consolidation of the estates, and the assets and liabilities of the estates are reflected as those of a single entity.

(*Id.* at 13.).

Applying the reasonable investor/creditor standard to this case, Judge Winfield initially noted that many of the creditors that approved the Plan had claims against all three debtors, and several of these creditors were co-proponents of the Plan. (*Id.*). As the Bankruptcy Court observed, Part II.C of the Second Amended Disclosure Statement estimated the recovery by general unsecured creditors. The accompanying chart detailed both the potential minimum and maximum recovery to the general unsecured creditors after subtraction of those amounts owed to priority claimants.

This Court has independently considered Part II of the Disclosure Statement. There the proponents described the liquidation of estate assets and the transfer of the assets to the liquidating trust; the liquidating trustee's authority to distribute trust assets to creditors in accordance with the Plan; and the trustee's right to litigate claims against the estate. It was also disclosed that the estates received proceeds from asset sales in the amount of $558,782; the priority claim of the secured lender in the amount of $5,998,316 was satisfied; and $1 million remained to satisfy claims against the estate. As noted above, the Disclosure Statement then estimated a minimum recovery to unsecured creditors of $1,123,947 and a maximum recovery of $9,404,110.

Reviewing the discretionary determination of the bankruptcy judge that the disclosure statement was adequate, this Court finds no error. The relevant assets and liabilities were disclosed, as well as the range of potential recovery to creditors. The Disclosure Statement acknowledged the uncertainty of recovery amounts based on several contingencies, including: the estimated amount of allowed general unsecured claims; anticipated recovery from preference litigation; recovery from litigation against insider Lisantis; anticipated amounts from accounts receivable; anticipated fees and costs; and the success of the proponents' objections to claims of the Lisanti insiders. However, such uncertainties are common and do not suggest in this case that the disclosure statement was inadequate.

### 4. *Powers of the Liquidating Trustee*

Appellants argue that the Plan improperly granted unlimited power to the Liquidating Trustee. Specifically, Appellants contend that the Plan permitted the Trustee to employ professionals, sell assets in the Trust Estate, and take legal action on behalf of the Trust Estate without the approval of the Bankruptcy Court. Appellants argue that these unlimited powers contravene the Code.

Appellees respond essentially that the Liquidating Trustee's power is not without limit; rather, he is subject to applicable law, the Oversight Committee, and the

continuing jurisdiction of the Bankruptcy Court.

A liquidating trustee is properly authorized to administer the post-confirmation estate and implement the Plan. Section 1123 of the Code allows a plan to provide for "the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, [of any claim or interest belonging to the debtor or to the estate]." 11 U.S.C. § 1123(b)(3)(B); *see In re Ampace Corp.*, 279 B.R. 145, 147 (Bankr.D.Del.2002) (noting that plan provided liquidating trustee with "sole discretion" to pursue avoidance actions for the benefit of holders of Allowed Unsecured Claims).

Appellees aptly cite *In re USN Communications, Inc.*, 280 B.R. 573, 579–80 (Bankr.D.Del.2002) in which the court described the discretionary function of the liquidating trustee in the subject plan:

> The Liquidating Trust shall succeed to all the rights of the Debtors necessary to protect, conserve, and liquidate all Liquidating Trust Assets as quickly as reasonably practicable. In that capacity, the Liquidating Trust shall have the exclusive power, on behalf and in the name of the debtors, to prosecute, defend, compromise, settle, and otherwise deal with all such Liquidating Trust Assets subject to the restrictions of the Liquidating Trust Agreement, this Plan, and the Confirmation Order ....

Here, the Plan vests the Liquidating Trustee with discretionary control over the affairs and assets of the Liquidating Trust, *in accordance with the Liquidating Trust Agreement, subject to the review and direction of the Oversight Committee.* (Appellees' Appx., Exh. 4, ¶ 5.8)(emphasis added). The Plan also details the supervisory authority of the Oversight Committee, including the power to supervise the Trustee's management of the Trust, the power

to remove the Trustee, and the right to approve the settlement of certain disputed claims. (*Id.* ¶ 5.9.). Finally, Article 11 of the plan provides for the Bankruptcy Court's retention of jurisdiction. Of particular relevance in Article 11 is ¶ 11(g), which ensures that the Bankruptcy Court resolves "disputes arising in connection with the interpretation, implementation, consummation, or enforcement of the Plan, including disputes arising under agreements, documents, or instruments executed in connection with the Plan." Thus, the Bankruptcy Court found that Plan provisions related to the Oversight Committee appropriately circumscribed the Trustee's authority. (*Id.*, Exh. 1, at 23 ll. 15–18.).

The Court is not persuaded that the protections afforded by the Liquidating Trust Agreement and the Oversight Committee, together with the requirements of the Code as enforced by the Bankruptcy Court, are somehow insufficient to warrant Plan confirmation.

### 5. *Classification of Claims*

■ Appellants argue that under the Plan Class 3 improperly consolidated the following creditors: (i) claims of creditors who dealt solely with Lisanti Foods, Inc.; (ii) claims of creditors who dealt solely with Lisanti Foods of Texas, Inc.; and (iii) claims of creditors who dealt solely with Lisanti Foods of Arizona, Inc. (Appellants' Br., at 24.). Appellants argue that as creditors of Lisanti Foods, Inc. (a debtor with a lower debt to asset ratio than the other debtors), their claims should be separately classified, thus entitling them to a greater distribution.

■ Title 11 U.S.C. § 1122 governs the classification of claims or interests:

(a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if

such claim or interest is substantially similar to the other claims or interests of such class.

(b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

Thus, similar claims are generally placed into the same class. "Substantially similar claims" are "those which share common priority status and other legal rights against the debtor's assets." *In re Fairfield Executive Assoc.*, 161 B.R. 595, 600 (D.N.J.1993) (citing *In re Greystone Joint Venture*, 995 F.2d 1274, 1278 (5th Cir. 1991)). As a result, "unsecured claims will, generally speaking, comprise one class ... because they are claimants of equal legal rank entitled to share pro rata in values remaining after payment of secured and priority claims." *Id.* (internal quotations omitted). Separate classifications for unsecured creditors are only justified "where the *legal character* of their claims is such as to accord them a status different from the other unsecured creditors." *Granada Wines, Inc. v. New England Teamsters & Trucking Indus. Pension Fund*, 748 F.2d 42, 46 (1st Cir.1984)(emphasis added).

 It is therefore legally appropriate to group all unsecured creditors into the same class. Appellants rely on *Granada Wines* for the proposition that creditors with claims against different property should be separately classified. That case considered the effect of Chapter 11 reorganization on an employer's obligations under the Employee Retirement Income Security Act. Specifically, the First Circuit addressed whether an employer undergoing Chapter 11 reorganization could reduce its financial liability to a pension fund creditor under certain provisions of the Multiemployer Pension Plan Amendments Act. The court decided that the employer was not entitled to a limitation of its liability to the pension fund.

The only conceivable relevance of *Granada Wines* to the claim classification issue here lies in the First Circuit's treatment of the argument that the amount of the disputed claim rendered it dissimilar from other unsecured claims and therefore susceptible to separate classification. The court found that the *amount* of the pension fund's claim does not implicate the legal character of the claim, and therefore separate classification was not warranted under the Code.

To the extent that Appellants' argument for separate classification here is based on the greater amount they believe they will be entitled to as creditors of Lisanti Foods, Inc., as compared to the other unsecured creditors, *Granada* is to the contrary.

Appellants also argue for separate classification because their claims and the claims of the other unsecured creditors are against different debtors. However, based on the foregoing discussion of when separate classifications are legally appropriate, the Court is not persuaded that separate classification on that basis is proper.

## IV. *Testimony of Appellees' Expert Accountant*

Appellants contend that they were prejudiced by the Bankruptcy Court's allowing Appellees' accountant to testify despite untimely submission of his expert report. (Appellants' Br., at 46–47.). Citing to Third Circuit precedent addressing the circumstances under which exclusion of testimony is appropriate, Appellants argue that (1) they were unable to effectively cross-examine Mr. Katz; (2) they were prejudiced by Appellees' unwillingness to alter the schedule of the Confirmation Hearing;

(3) the untimely submission of the expert report amounted to bad faith; and (4) they were unable to prepare an effective rebuttal to Mr. Katz's testimony. (*Id.*). Furthermore, Appellants maintain that the Bankruptcy Court compounded the harm by precluding the testimony of their own accountant.

■ Appellees counter that this issue was not included in Appellants' Statement of Issues on Appeal and therefore may not be considered in this appeal. Nevertheless, Appellees respond that, when reviewed under the abuse of discretion standard applicable to evidentiary rulings, the Bankruptcy Court's decision to allow Mr. Katz's testimony was proper. (Appellees' Br., at 38–39.). The Court reviews the Bankruptcy Court's evidentiary determination for abuse of discretion. "An abuse of discretion exists where the [bankruptcy] court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." *In re Integrated Telecom Express, Inc.,* 384 F.3d 108, 118 (3d Cir. 2004). " 'An abuse of discretion can occur when no reasonable person would adopt the ... [lower] court's view.' " *In re PPI Enter. (U.S.), Inc.,* 324 F.3d 197, 211 (3d Cir.2003)(quoting *Rode v. Dellarciprete,* 892 F.2d 1177, 1182 (3d Cir.1990)).

■ Over the objections of Appellants' counsel, the Bankruptcy Court allowed Mr. Katz's testimony on the following grounds:

I'm not going to disallow Mr. Katz's testimony. I will hear his testimony. I will repeat again, the parties have ample opportunity to work out the timing of various submissions or reports and documentary evidence requested. I have myself seen though, not reviewed in any depth, Mr. Katz's report ... Having received it prior to the deposition, there was ample opportunity to examine Mr. Katz on the information contained therein. I have ... ample statements that support that they, by that I mean the Trustee and his counsel, turned over all the documents requested of them, and I see no reason not to have Mr. Katz's testimony on the record.

(Appellants' Appx., Exh. 11, at 101.).

The Bankruptcy Court found that on the facts before it, and the representations of counsel, Appellants had an adequate opportunity to review the substance of Mr. Katz's report and prepare for his deposition. These are critical factual determinations which the Court sees no reason to disturb. Accordingly, the Court finds that it was not an abuse of discretion for the Bankruptcy Court to hear Mr. Katz's testimony.

■ In a related matter, Appellants contend that they were prejudiced by the Bankruptcy Court's exclusion of the testimony of their own expert accountant, Michael Gould. The record indicates that, despite Judge Winfield's ruling that Mr. Katz could be present at Mr. Gould's deposition, Appellants refused to produce Mr. Gould for his deposition. (Appellees' Appx, Exh. 12) ("[W]e're maintaining our position that Mr. Katz is not a party and it is not appropriate for him to be present during the course of the deposition ...."). No authority is cited by Appellants for this position.

Federal Rule of Evidence 615 provides that "[a]t the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses .... This rule does not authorize exclusion of ... (3) a person whose presence is shown by a party to be essential to the presentation of the party's cause." As Appellees note, the Advisory Committee Notes explain that category (3) "contemplates such persons as ... an expert needed to advise counsel in the management of the litigation."

 Federal Rule of Evidence 615 applies to deposition testimony. *See, e.g., Skidmore v. Northwest Eng'g Co.,* 90 F.R.D. 75, 75–76 (S.D.Fla.1981); *Williams v. Elec. Control Sys., Inc.,* 68 F.R.D. 703 (E.D.Tenn.1975)("[Rule 615] gives a litigant the right to have witnesses excluded from the courtroom, except for three categories who are excepted from its operation. The same rule applies to the taking of depositions."). "The party seeking to exclude persons from depositions must show good cause, and the protection is limited to circumstances where justice requires such exclusion to protect a party from annoyance, embarrassment, oppression or undue burden or expense." *Skidmore,* 90 F.R.D. at 76. However, "the long-accepted policy reasons for the sequestration rule preventing one witness from conforming his testimony to that of another are not applicable when an expert is involved" because the expert testifies not to disputed facts but matters of opinion. *Id.; see also Veress v. Alcoa Mill Prod., Inc.,* No. 01–2430, 2002 WL 1022455, at *1 (E.D.Pa. May 20, 2002).

The Bankruptcy Court held that Federal Rule of Evidence 615 did not apply to bar Mr. Katz from the Gould deposition:

> With respect to Rule 615, that's a rule that deals with testimony at trial, and I would agree it certainly ought to, in general, apply to excluding witnesses at deposition testimony. But I read that rule to be geared toward fact witnesses. It is not uncommon ... to have I'll call them professional advisors, since there are any number of professionals that assist attorneys in various types of litigation anymore, present at deposition to listen to the deposition testimony of other professional expert witnesses.

(*Id.,* Exh. 2, at 31.).

The Court also notes that Rule 615's Advisory Committee Notes specifically forbid the exclusion of experts needed to advise counsel, as here. Appellants' "position," quoted above, disregarded or was unaware of the Advisory Committee's interpretation (which this Court adopts).

The Court agrees with the bankruptcy judge that Rule 615 is primarily directed at the exclusion of witnesses at trial, but also applies to depositions. The Court sees no reason to bar one party's expert witness from the deposition of the other party's expert. It is common for experts to assist attorneys in connection with deposition testimony of opposing experts. Therefore, it was entirely appropriate for Judge Winfield to exclude the testimony of Mr. Gould, based on Appellants' unwarranted refusal to produce him for his deposition.

Accordingly, **IT IS** on this 9th day of August 2005,

**ORDERED** that the May 17, 2004 Order Confirming Second Amended Joint Plan of Liquidation is affirmed.